AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Black Samsung Cell Phone<br>Seized as FP&F No. 2023565300047301 Line Item 0002<br>("Target Device") | Case No. **23-mj-1245** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the     Southern     District of     California    , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, U. S. C. § 1324 | Alien Smuggling |

The application is based on these facts:
See Attached Affidavit of Border Patrol Agent Jesse Bojorquez, incorporated herein by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jesse Bojorquez, Border Patrol Agent, U.S. Border Patrol
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ~~telephone~~ (specify reliable electronic means).

*Judge's signature*

Date: 04/07/2023

City and state:  San Diego, California          HON. Daniel E. Butcher, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A

PROPERTY TO BE SEARCHED

The following property is to be searched:

Black Samsung Cell Phone
Seized as FP&F No. 2023565300047301 Line Item 0002
("Target Device")

Target Device is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **March 6, 2023, through April 6, 2023**:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States; and transport aliens inside the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which is evidence of violations of Title 8, United States Code, Section 1324.

# AFFIDAVIT

I, Jesse Bojorquez, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices:

>Black Samsung Cell Phone
>Seized as FP&F No. 2023565300047301 Line Item 0002
>("Target Device")

the "**Target Device**", as further described in Attachment A, and to seize evidence of crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2. The requested warrant related to the investigation and prosecution of Alfredo Javier JIMENEZ for transporting and moving illegal aliens within the United States. The **Target Device** is currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all my knowledge of the investigation into this matter. Dates and times are approximate.

## TRAINING AND EXPERIENCE

4. I have been employed by the USBP since 2018 and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for four years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5. My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6. During my tenure as a Border Patrol Agent, I have participated in the investigation of several cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work

2

in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

   a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

   c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

   d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

   e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

4

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On April 6, 2023, Border Patrol Agents R. Rojo, R. Brudnok, T. Fichera, K. Ruck, E. Cortez, and J. Arellano were performing assigned duties in the Brown Field Border Patrol Station area of responsibility. At approximately 6:00 AM, Agent Rojo was advised, over the service radio, from Department of Defense personnel operating the "Flume Scope," that an unknown vehicle pulled over in an area commonly referred to by Border Patrol Agents as the "54 Cut." At approximately 6:01 AM, the Flume Scope Operator reported that two individuals were getting into the vehicle parked at the "54 Cut." Agent Rojo responded to the area. At the intersection of State Route 94 (SR 94) and Barrett Smith Road, the Flume Scope Operator advised Agent Rojo that the vehicle in question was passing the Agent's current location. Agent Rojo immediately got behind the vehicle and observed that the vehicle was a grey BMW bearing a California license plate.

12. At approximately 6:08 AM, Agent Rojo requested records checks through the San Diego Sector Tactical Communications Center and attempted to initiate a vehicle stop near the intersection of SR 94 and Community Building Road. Agent Brudnok observed the BMW followed by Agent Rojo approaching his position. The BMW came to a stop at the intersection of SR 94 and Community Building Road. Agent Brudnok exited the vehicle and walked towards the BMW to assist Agent Rojo who was approaching from behind the BMW. As Agents Brudnok and Rojo approached the BMW, the vehicle suddenly accelerated turning back onto the road. Agent Brudnok advised via agency service radio that the vehicle had failed to yield by fleeing from initial stop location and was now traveling west on SR 94.

13. At approximately 6:10 AM, Agent Fichera witnessed the BMW traveling west at a high rate of speed passing his location. Agent Fichera, had positioned his marked U.S. Border Patrol vehicle at the California Fire Department Dulzura Station located ahead and west of the initial stop location. Agent Fichera attempted to conduct a second vehicle stop on the BMW. The driver of the BMW, later identified as the defendant Alfredo Javier JIMENEZ, did not stop. Agent Fichera observed the BMW drive across double yellow lines and against traffic.

14. At approximately 6:11 AM, Agent K. Ruck positioned his marked U.S. Border Patrol vehicle facing west on the shoulder of SR 94, approximately a quarter mile east of the SR 94 U.S. Border Patrol Checkpoint. Agent Ruck observed the BMW approaching his position at a high rate of speed. As the BMW passed Agent Ruck, Agent Ruck drove his vehicle behind the BMW traveling west on SR 94 and attempted a third vehicle stop.

15. The BMW approached the SR 94 U.S. Border Patrol Checkpoint, disobeyed the established traffic cone pattern. The BMW drove against traffic in order to avoid the primary lane and being immobilized by the Vehicular Immobilization Device (VID) prepared by Agent Cortez. The BMW attempting to avoid the VID, lost control and drove off the road, crashing into a dirt embankment approximately 50 yards west of the checkpoint.

16. Agents Cortez and Arellano were assigned checkpoint duties at the SR 94 U.S. Border Patrol Immigration Checkpoint. After the BMW came to a stop, Agent Arellano approached the BMW and opened the back passenger door to assist two individuals later identified as Saul NICOLAS-Marcos, and Juan Carlos MORENO-Mares. Agent Arellano identified himself as a Border Patrol Agent and asked if NICOLAS and MORENO were okay. Both individuals stated they were a little shaken up, but otherwise okay. Agent Arellano conducted an immigration inspection on NICOLAS and MORENO. NICOLAS and MORENO stated they were from Mexico and did not have immigration documents to

be in the United States. At approximately 6:20 AM, Agent Arellano placed NICOLAS and MORENO under arrest. Simultaneously, Agent Cortez approached the driver's side door, ordered JIMENEZ out of the car and placed him under arrest.

17. At the time of arrest, a black Samsung Galaxy cell phone **(Target Device)** was found in defendant Alfredo Javier JIMENEZ's hand. The device was subsequently seized.

18. MORENO-Mares stated that he was born in Torreon, Coahuila, Mexico. MORENO stated he is a citizen of Mexico, and both his mother and father are also citizens of Mexico and that he does not possess any legal Immigration documents to allow him to enter or remain in the United States. Regarding today's smuggling event, MORENO stated he entered the United States on Wednesday April 05, 2023 at approximately 8:00 PM, by walking around the border fence in Tecate, California. MORENO stated he was being paid $1,000 USD for this smuggling event involving material witness Saul NICOLAS-Marcos. MORENO stated their destination was Orange, California. MORENO stated he is working for an individual that goes by "El Kevin". MORENO stated they made it close to the road by 1:00 AM. MORENO stated "El Kevin" sent him a message around 6:00 AM that the vehicle was nearby. MORENO stated he then began walking towards the road. MORENO stated that when a gray BMW sedan arrived at his location, he opened the rear door and that's when the driver told them in the Spanish language to get in the vehicle. MORENO stated they were in the vehicle for approximately ten minutes prior to them being pulled over by Border Patrol. MORENO stated when Border Patrol activated their lights and sirens, the driver was on the phone with the coordinator talking in Spanish. MORENO stated he overheard the person on the phone tell the driver to take off. MORENO stated the driver stopped and withing a few seconds, fled. MORENO stated he was telling the driver to stop, but he would not say anything. MORENO stated in the process of fleeing, the driver threw stuff out the window in three different occasions. MORENO stated he believed that the driver was going 80 miles per hour in the curbs. At that point MORENO

stated they both hunched down and held down. MORENO stated at that moment is when the driver lost control and crashed. MORENO stated he feared for his life.

19. Material witness Saul NICOLAS-Marcos stated that he is a citizen of Mexico without any immigration documents allowing them to enter or remain in the United States legally. NICOLAS stated he made smuggling arrangements and agreed to pay $200,000 MXN pesos with an unknown individual. NICOLAS stated on the night before his smuggling event, he was taken to a house where he met someone who introduced himself as a foot guide and instructed him to prepare his bag with $300 MXN pesos worth of food and water for his illegal crossing into the United States. Nicolas stated that at approximately 8:00 PM, NICOLAS and his foot guide made entry into the United States by crossing a creek and making their way north through the mountains. NICOLAS stated the foot guide told him that their pick-up vehicle should be there at around 6:00 AM. NICOLAS stated the guide would get on his cell phone and was advising someone they were getting closer to the road. NICOLAS stated the foot guide made another call and advised someone they were ready to be picked up. NICOLAS stated a dark BMW showed up. NICOLAS stated they were unsure if it was the vehicle but then someone in the vehicle yelled out what he believes was the code word. NICOLAS stated the foot guide grabbed him and told him that was their ride. NICOLAS stated they both entered through the rear passenger door. NICOLAS stated the driver was on the phone with someone and was getting instructions on where to go. NICOLAS stated shortly after, the driver told the person on the phone that there was a Border Patrol vehicle driving in front of him and two tailgating behind him. NICOLAS stated the person on the phone told the driver to relax and drive normal. NICOLAS stated he heard the sirens behind them, and the driver pulled over on the side of the road. NICOLAS stated the person on the phone told the driver to take off. NICOLAS stated the driver took off at a very high rate of speed and began to driver erratically. NICOLAS stated the vehicle felt like it was going to flip a few times causing him to fear for his life. NICOLAS stated the person on the phone asked the driver

8

if he lost the Border Patrol to which the driver answered no. NICOLAS stated the vehicle crashed and all the airbags deployed. NICOLAS stated the vehicle was full of smoke and the foot guide told him to open the door. NICOLAS stated the Border Patrol was outside and arrested him and his foot guide.

20. Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Device**. In light of the above facts and my experience and training, there is probable cause to believe that the defendant, Alfredo Javier JIMENEZ, was using the **Target Device** to communicate with others to further illegal entry into the United States. Based on my training and experience, it is also not unusual for individuals, such as defendant JIMENEZ, to attempt to minimize the amount of time he was involved in smuggling activities, and for the individual to be involved for weeks and months longer than he claims. Accordingly, I request permission to search the **Target Device** for data beginning on **March 6, 2023, through April 6, 2023**.

## METHODOLOGY

21. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the devices may only be powered in a secure

9

environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device.

22. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the devices may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the devices manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

23. Following the issuance of these warrants, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephones and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of these warrants.

24. Based on the foregoing, identifying and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days from the date this warrant is signed, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

25. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

## CONCLUSION

26. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Device** will yield evidence of alien smuggling, a violation of Title 8, United States Code, Sections 1324.

27. Because the **Target Device** was seized at the time of Alfredo Javier JIMENEZ's arrest; and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Device**. As stated above, I believe that the appropriate date range for this search is from **March 6, 2023, through April 6, 2023**.

28. Accordingly, I request that the Court issues a warrant authorizing law enforcement to search the item described in Attachment A, and seize the item listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Jesse Bojorquez
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this the 7th day of April 2023.

_____
Hon. Daniel E. Butcher
United States Magistrate Judge

11